Next case is United States, America v. Rochelle Bates Robert Epstein Good morning. My name is Robert Epstein and I'm here today on behalf of the appellant, Mr. Rochelle Bates. And with the court's permission, I'd like to request three minutes of my time for rebuttal. Thank you, Your Honor. The issue on this appeal is the sufficiency of the government's evidence with respect to count one of the indictment charging Mr. Bates with the possession, i.e. the constructive possession, of approximately $200,000 of heroin that was found in the upstairs bedroom of his former home, a house that he, his mother, and his mother's boyfriend had moved out of several weeks earlier. Three weeks earlier? Yes, Your Honor. And he retained the key? He retained the key. Is there any evidence in this case that, as I understand it, your client was seen exiting 1474 Lardner by Officer Toomer on October 7, 2008, correct? Correct, Your Honor. Why was Mr. Bates there that day? We would only have to speculate. From this record, all we can do is speculate as to why he was there that night. He might have been there for an innocuous reason. He could have been using the restroom or doing laundry. That is exactly what the district court suggested, that he might have been there using the bathroom. Or keeping an eye on $200,000 worth of heroin. We can only speculate as to that because there's absolutely zero evidence in this record connecting him to the heroin upstairs. There's not even evidence in this case that Mr. Bates had knowledge of the heroin in the bedroom. There's not even evidence that the heroin was there on that day. The police discovered it the next day, 27 hours after Mr. Bates had exited the home. What about the expert testimony? That's something I don't think we had in the other two cases, did we? The expert that says these would normally be kept in a secure location that only people who were related to the drugs would have access to. How do you get around that? Wouldn't that be enough for a jury to hang this conviction on that? No, Your Honor. There's zero evidence in this case that Mr. Bates was permitted access by the people who owned this heroin. He had the key because he had moved out three weeks earlier. And he could have just let himself in, either to use the bathroom that day or perhaps to snoop around. Does the jury have to believe that somebody who is trafficking $200,000 in heroin would be so careless as to put it in a residence that the former resident recently vacated and still had the key to? Well, there's no evidence. There's no reason to think that the people who own this heroin, who are making use of this home, would have thought that a former tenant might have retained the key and moved in. People move into houses all the time. They don't think that former tenants were residents. We don't know who was living here, though, right? Correct, Your Honor. Testimony from the landlord was nobody moved in. Correct. Is there anything in the record to indicate that anyone was observed either entering or exiting 1474 Larimer Street other than your client? Yes, Your Honor. There's undisputed testimony from a defense witness that a group of Hispanics had taken over that house about a week or two after Mr. Bates moved out. In addition, there was undisputed testimony from the realtor that he had heard that from one of the neighbors. Well, he had taken over the house, and the landlord said nobody re-rented it, so the landlord didn't give a key to this group of Hispanics. No, I never said that. So how do they take over a house? Well, as the realtor testified to him, this was undisputed, the back door was broken in. So perhaps they broke in through the back door. We really don't know. We're in that zone of speculation. So they might have broken in, or your client might have let them in through using the key. We have no idea. That's a jury question. No, that would be just speculation. See, with all these constructive possession cases that we cite in our brief, where the evidence was found insufficient by both this court and other circuit courts throughout the country, the distinction is between what is substantial evidence, and that's what this court is reviewing for, substantial evidence from which a reasonable inference of guilt could be made beyond a reasonable doubt on the one side, versus speculation from a lack of evidence. Let's look at our cases. Let's look at Brown and Jenkins. In Brown, Alma Baltimore was convicted, and our court reversed that conviction, right? Correct. Was there any evidence to suggest that Alma Baltimore was a drug dealer? Well, there was evidence that she had a key to the house, that she was residing in the house. She had what we don't have here. There was evidence both that she had knowledge of the drugs in her house and close proximity. But it was her residence, though. She was living there. Correct. Here, we don't have another person living in this house. This was Mr. Bates' house. It was. And it's undisputed that he was no longer living there. That is not undisputed in this case. But it was undisputed he could come and go as he pleased. Well, he retained the key to the house. So he's in the same position, I would submit, as the defendant, Alma Baltimore. No, not so, because at least we found that she knew there were drugs there. Right. There's no evidence that he knew there were drugs there. There's no evidence he ever sold them. There's no evidence he went up to the second floor at any point. There is no evidence he did anything other than walk out that door one day. That is correct, Your Honor. So, in fact, Mr. Bates is in a far better position than Alma Baltimore. My point only in that matter was he did the same thing. Jenkins is sitting in his underwear next to a table with cocaine and two cocaine scales, and they found that's not enough evidence of dominion any more. That's correct. Now, this case is far, far weaker from the government's point of view than Jenkins for those reasons. But there's always somebody else involved. Baltimore's boyfriend or husband was convicted. Can you point to every case I've found nationally dating back to the 60s, circuit court cases, every single case I've found where a court of appeals reversed a jury determination of guilt in a constructive possession case. Every single one of them involved that person being part of a larger group. The chief perpetrator was always the husband, the boyfriend, the three other guys, etc. Can you cite for me any case where the only person who had access to the premises was the one defendant who was found guilty like Mr. Bates was in this case? I can, but I would submit that this case falls squarely within all of those cases that you just made reference to. Before you go there, tell me if there are any cases where the sole person with access to what appears to be a stash house, the sole person with access to the stash house had their conviction reversed. I can, Your Honor. And that would be the Vasco Chan case from the Ninth Circuit, 978 F. Sapien. The relevant pages that I have are 549 and 551. That case is discussed at length in Jenkins. In that case, the two defendants were the only two people found at a house with 650 kilograms of cocaine. I'm sorry, I didn't make my question clear. You said two defendants. I'm asking you for a case where a court of appeals reversed the conviction of a sole actor. My point with Vasco Chan is there were no other actors. I'm going to let you talk about Vasco Chan. I'm asking you, is there any case where one person was convicted, and that was the sole person who had sole access or proximity to the drugs? No, Your Honor. Tell us whatever you'd like about Vasco. Well, I'll tell you first about just the facts of this case. There is no dispute from the government that there were other actors besides Mr. Bates. They're alleging Mr. Bates to be involved. Who are these other actors? We don't know who they are. There's no evidence of it. We don't know. We have to review the record in the light most favorable to the verdict. The verdict was guilty. So are you telling us that we have to accept as true that a group of Hispanics broke down the back door and went into this, forcibly entered this premises? Yes, Your Honor. Well, for this reason. That's contrary to the verdict. That's not supportive of the verdict. The government's evidence was that from their drug trafficking expert that this was not a one person operation. That there were a number of people that must have been involved with this heroin in this house to put the heroin into 363 little bags. Multiple people. We have a ledger book that's written in Spanish that's found with the heroin and it's undisputed Mr. Bates doesn't speak Spanish. We have a credit card found to cut the heroin in the name of a Hispanic woman. So this is all the government's evidence and there's no dispute from the government. The prosecutor argued to the jury that there were multiple people involved in the heroin. The only question was whether there was substantial evidence to connect Mr. Bates to the heroin. And there is not. When we look at the evidence of these constructive possession cases, all of them where the government's evidence was found to be insufficient, this case is the weakest of them all. You concede, and I'm surprised you even conceded, that he was in proximity to the heroin. I don't even see that. But let's just say because he was coming out of the house, one can say he was in proximity to heroin that was on the second floor. But that's not enough. That's all they have. That's correct. And we don't even realize that. You're right because there's no evidence that the heroin was in the house on the same day that Mr. Bates was seen coming out of the house. Whatever. There's no evidence. He knew it was there. There's no evidence that he was ever close to it. You know what I mean? And the crack. The crack he was distributing. He distributed no heroin. He had no heroin on him. There was different packaging. Nothing in Chicago. Different colors. Different drugs. There's no connection. Yes, Your Honor. And, in fact, responding to Judge Manny Torpin's question about the drug trafficking expert's testimony, that testimony was actually a negative for the government with respect to the heroin because he testified that he would not think that a member of the heroin organization, the heroin conspiracy, would be dealing drugs from that location. Would be sitting across the street doing petty drug deals. So it makes no sense that if Mr. Bates was actually a part of this heroin conspiracy that he would have been selling crack right outside of the house and bringing the police to the heroin. Bates didn't speak Spanish either, did he? No, he did not. No. Do you recall if there was an instruction to the jury on aiding and abetting in this case? I don't believe there was, Your Honor. Okay. And the government hasn't made an aiding and abetting argument on this appeal. Why is it irrational for the jury to conclude that the prime movers of the heroin would hire Mr. Bates to use his former residence as a stash house? They would hire Mr. Bates to... We know this happens all the time, right? People, big-time drug dealers trafficking kilos of cocaine, heroin, they hire people to stash the drugs, right? We call them stash houses, right? Is that right? Well, I don't know that they hire people to find a stash house for them. They just find a stash house. They go to some guy and they say, you know, hey, we're paying you $100 a month to use your place to store our drugs for a little while until we can move them to the street. Is that accurate that that happens? That could be. We have no evidence of it happening here. I'm asking, why is it irrational for this jury to conclude that that's what happened here? Well, they would have to have substantial evidence to put it beyond a reasonable doubt, and we don't have any evidence. And it doesn't even make sense because Mr. Bates no longer has... He comes and goes as he pleases. We have him leaving once, not coming and going as he pleases. Well, if he has the key to the place, until they change the locks, he comes and goes as he pleases. We only know that he came out once. But the thing is, he does not have sole control of that house by any means. There's a realtor that has control of that house at that point. Who's put a lockbox on the house? I don't know what arrangement this drug, this heroin conspiracy may have had with somebody, maybe with the realtor. There's absolutely nothing showing that they had an arrangement with Mr. Bates, though. Okay. All right. We'll hand you over to the final instruction. Ms. McKillop? May it please the Court, my name is Emily McKillop. I represent the United States. Your Honor, as Judge Hardiman recognized, the crucial fact, and this is a piece of evidence despite defense counsel's assertion that there is no evidence. The evidence is this is a vacant house. Moreover, the evidence, and this is undisputed, unlike some of the facts defense counsel claimed were undisputed, the undisputed evidence is there was $200,000 of heroin, a very valuable and very illegal quantity. With a backdoor bashed in and people going in and out at will. And the only people going in and out at will, Your Honor, were the defendant. One time. Yes, Your Honor, but there are a couple points that make it interesting. Is that correct or not? Excuse me, Mary. Is it correct or not that there was forced entry into this? Your Honor, we are here on an evaluation of whether reasonable, any reasonable jury could have reached a verdict at this date. And therefore, Your Honor, we should look at the government's evidence. Everything on which defense counsel relies was introduced in the defense case. And the jury was entitled to disregard it, not to believe it, if they chose to do so. And in fact, Your Honor, if you look at the district court's opinion denying the motions, she didn't believe the neighbor and friend, Quanda Crawford, who testified about these Hispanics moving in. The district court didn't believe it. The jury was entitled not to believe it. However, we think it's quite possible that there were other people involved, some of whom speak Spanish. And by the way, there's nothing in the record either way about whether Mr. Bates was Spanish. But you don't concede that Bates is not at the top end of this heroin scheme. He's a crack dealer, right? Your Honor, I think he functions in two roles in this case. Yes, he's a crack dealer. He was engaging in his own little crack business while he was also acting as a person who provided access to this house and who provided a watchful eye over this house. Where did he provide, number one, where did he provide access to this house, number two? And then I want to discuss with you your armed guard theory. But your first question, where did he provide access to other people? Is there any hint of that in this record? Your Honor, if I may just say, Judge Antwerpen asked me a two-part question and part of it was about the back door. May I respond to him first or should I respond to him? No, you should respond to his question. Your Honor, the testimony about the back door being broken in came in the defense case, and it was from the property manager. And that evidence was that several days after the search warrant had been executed, he was alerted by someone, and it doesn't appear in the record, that drug arrests had been made in the house and the back door was bashed in. He said he went there, he did find the back door bashed in. Significantly, he says nothing at all about the front door being bashed in, nor do any of the police witnesses. Now, whichever police officer made entry to the house first did not testify. It may have been a SWAT team, we don't know. It doesn't appear in the record. However, none of the officers who entered the front door noticed that it was bashed in, and, in fact, one of them, Sergeant Freo, actually tried to defend its key in that door and does not recall any signs of it being bashed in. Therefore, Your Honor, I suggest a reasonable inference, and we do have to draw reasonable inferences in favor of the government, is that the back door was bashed in by the police when they gained entry to this house because how else would they have gotten in? The only person we know who had a key to that house is the defendant, unless, of course, you believe that the property manager is responsible for these drugs. And I would suggest there are two reasons to believe that the property manager was not responsible for these drugs. First of all, if you own the property, if you have the legal right to do something to it, as a manager would, if you're going to put something worth $200,000 in a house, in a vacant house, the first thing you do is change the locks. We know that didn't happen because the defendant, who recently moved out, had a key that still opened that house. Second of all, there was a lockbox. Now, again, the evidence about the lockbox came in in the defendant's case. However, if the property manager had been the one putting the drugs there, he wouldn't have put on a box that allowed other people to get in and out that way. So, Your Honor, and I'm moving on to Jeff Berry's question, the only person we know of who had access to this house was the defendant. In the wheelchair? Well, in the wheelchair, Your Honor, but... But you said he provided access to other people. That's why I asked you the question. And where is there any evidence that he provided access to others? Your Honor, if the defendant did not, by himself, bring in $200,000 worth of heroin, he may have been working with other people, he may not have, but we'll assume that he was working with other people and that some of them spoke Spanish. They got in there somehow. And the only person we know of, other than the wheelchair driver, I believe the real influence is, wasn't involved. The only person we know of who had a key was the defendant. And moreover, Your Honor, that was the only key he was carrying. He had it on a lanyard, and he was right across the street from this particular house. How did he get into 1446 after he did his little crack deal? Your Honor, there's no evidence at all about that. There's nothing in the records... There's evidence he didn't go back to 1474. The evidence says he went to 1446. And, Your Honor, I suggest the influence from that is that his crack deal was connected with whoever was in 1446. Yes. Right. But, Your Honor, as I said, there's a dual role here. The defendant's a crack dealer on that block. He sells on the street there. He happens to have access to a house that he knows is vacant. Now, how would someone other than the defendant know the house is vacant? The defense very kindly put into evidence the pictures of the house, and the picture is of 1471 across the street. If you look at this, this is not... Although it was a house being used solely for the processing of drugs, and for that reason that is why Brown and Jamies are distinguishable in this very helpful language in Brown. But this was a house vacant being used solely for the processing of drugs. And your argument is that stash houses or vacant houses are of a different piece than places where people live and multiple persons are found in that residence where drugs are also found. Are you saying there's a different line of case law, or we should establish a different line of case law for stash houses or vacant houses? Your Honor, I'm not just saying that. This court has said it. Where? In Brown, the court discusses at some small length the Brett decision from the Eighth Circuit, which did involve a so-called crack house. And this court said possession of the key to the crack house would indicate a much greater likelihood that the defendant was involved with the drugs found therein than Baltimore's possession of the key to Brown's home. Tell us what else we said in Brett. What other evidence there was? The defendant lied to the police about his identity. He fled. He lied about the facts of where he had been. So you are just dealing with a guy who had a key, and that's about all we have here. Your Honor, I disagree that we are dealing here with a guy who had only a key. We had a guy who had a key who was across the street. Now, he was dealing crack, but there are, as defense emphasized, perhaps 40 houses on this block. It's a long block. And as we've established, the defendant's crack connection probably was in 1446, way down the block. Why does he choose 1471, right across from this house that defense would claim he moved out of, he has no connection with? Now, Your Honor, they say 1471 is on those steps rather than 1474 because they're higher and they afford a greater vantage point. Precisely, Your Honor. The vantage point is so that he can watch the door of 1474 because he knows there's crack in it. Let's get into your armed guard theory. Your Honor. That's the phrase you used. Let's just talk about the one time he came out of 74, the one day he came out of 74. He goes across the street. He sits on the steps. A few minutes later, the CI comes, does his deal. CI leaves, and he leaves shortly thereafter. That's true testimony. This is the armed guard. No, Your Honor. And the second day, before his arrest, you had him sitting on the steps when they come to arrest him. And there's no evidence, none whatsoever, that he'd been there for any length of time. We don't know how long he was there or how little or how great a time he was there. We do know the first day he was only there for minutes. I don't believe we do know. Oh, yes, Your Honor. However, on that day, we do not know whether the house was empty. Again, the circumstances. So you're saying on the day that he's seen coming out of 74, we don't know that the house was empty or that there was even hell in there on that day. We do not, Your Honor, except for one thing. There was a period of surveillance done between the buy on the 7th and the search warrant on the 8th. Unfortunately, the record is not clear. But you don't have him in the surveillance. They don't have anybody moving anything in and out of that house, Your Honor. And it is unclear. The duration wasn't established. But they certainly don't see anyone moving in. All right. I suggest that the use of the phrase armed guard is quite strong, given the facts or lack thereof. Your Honor, I'm not going to wed myself to a two-word phrase. I do suggest— But you did in your red brief. Your Honor, perhaps it was an aptly phrased, but I suggest, Your Honor, that the defendant was armed. There's no dispute about that. He had 11 rounds in a gun in his waistband. And he chose to be directly across the street at a place where he had a good vantage point of that house. Sure, during the drug deals. Your Honor, I will refer back to Judge Hardiman's point during my opponent's argument that this is a hugely valuable and incriminating substance. No one's going to leave that alone in a house to which they have no right of access and no ability to bar other people's access. You're right. Your Honor, I believe— But we're—something we've not discussed yet today. Where is your evidence—and this is what you had to show to the jury— that he had dominion and control over that heroin? Your Honor, there is no one else there. Absolutely undisputed. There was no human being in that house. He had a key to that house, and once more, Your Honor, he openly— we only know of one instance, although in the defense case, Ms. Crawford testified the defendant was frequently in that neighborhood, frequently in the area, came back to visit people. However, on the 7th, he openly exited that house. And that's crucial, Your Honor, because if, hypothetically, one of the people just happened to move drugs into this house, first of all, how did they know it was vacant? It doesn't appear to be an abandoned property, so they had to conduct some sort of observation to determine that it was vacant. And, Your Honor, in order to go against the jury's verdict, we would have to say that the only reasonable inference is that they happened to overlook the defendant's presence in the neighborhood, as the defense case established for us, and the fact that he, without making any attempt to hide his presence, went in and out of that house. If a drug cartel hires a guy and pays him $100 a month or $100 a week to use his former residence as a stash house, does that person getting $100 have ipso facto constructive possession over the drugs that are stashed therein? If there is no other member of the organization present, that's the difference between Jenkins and this case. And also... All right, so if your surveillance team had indicated that on the day in question Bates did not go in alone, but he went in with four guys who looked like they were just off the plane from Columbia, then you lose because this case looks like Jenkins? I don't know that we lose, Your Honor. It is a less strong case than it is. But to answer your question... It's a strange distinction, isn't it, though? Because I think we all have to recognize that in light of the evidence, different drug, $200,000 worth, Spanish, we know that Bates, if he was involved here, we know he's not running this game on his own. We know he's a big player in this deal. He's a straight metal crack dealer. Your Honor, we know that he is a straight metal crack dealer. We do not know whether he was anything in addition to that. Remember, all reasonable inferences have to be taken in support of the verdict. So as we suggest, the evidence shows he had a dual role here. And the evidence shows... So get back to that, then. Let's assume his role was... I'm proffering for you what I would submit is the most likely scenario if you're right. Namely, he's not an essential cog in a heroin distribution ring. He allowed someone to park their very valuable quantities of drugs in his former residence for a short period of time. And is that tantamount to constructive possession? Is hosting a stash house of a different drug for an organization you're not a part of, is that ipso facto constructive possession over that different drug? It is, Your Honor. If those people leave you alone, armed with a gun, across the street, when you've got a key to that house, and there is no one there to stop you from going in and taking those drugs. Because you're in charge of it. That's your point. Yes, there's nobody there who can stop the defendant from going in and putting all that heroin in his pocket. You're assuming he was there. Your Honor, that's a reasonable inference. It's a small house. He was seen openly coming out the day before. Well, what about the second floor? Your Honor, I don't see it in a house this size. The bathroom's probably on the second floor. But Your Honor, that's an inference that should be drawn. I suppose there's a narrow line between inference, permissible inference, and speculation, isn't there? Your Honor, in response to Judge Harden's inquiry, may I just direct the Court's attention to two cases. Now, these were not cited in our brief, but the defense is aware of them because they were cited in the trial court-level pleadings on the motion for insufficiency evidence. One of them, which I'm sure the Court knows well, is Jackson v. Byrd, and the cite on that is 105 F. 3rd, 145. Now, in that case, there were drugs found in the rear bedroom of an apartment, and this Court found there was sufficient evidence to convict the lessee of that apartment, even though the evidence was she lived in the front bedroom, not the rear one. And in the course of that decision, the Court stated, also it is not disputed that at the time the police executed the warrant, only Jackson, the defendant, and her infant son were in the apartment so that her brother, who used the rear bedroom, could not have excluded her at the time if she sought to enter the rear bedroom. So this Court found that, as this defendant had the ability to take possession of that drug without anyone there to exclude you, was evidence of constructive possession. The other decision which I'd like to refer the Court's attention is a non-precedential opinion. It's United States v. Muzychka, and I'll spell that M-U-Z-Y-C-H-K-A. It's at 410 Fed Appendix 437. That's a 2011 decision of this Court. And in that case, we have what we have in this case, a vacant building. Muzychka involved in meth lab. There was a fire there. It was a vacant building, and similar to this case, the building was owned by the defendant's mother. And they found in that building some personal property of a minor nature belonging to the defendant. It was a Sam's Club card, and there was a computer that showed he used it for some unrelated email. And based on that evidence, this Court found that there was sufficient evidence that the defendant was in constructive possession of the meth lab. And in the course of saying that, the Court observed, unlike in Brown, the evidence supports a finding that Muzychka was the primary user of an otherwise uninhabited building that housed a clandestine meth lab. That in excess of the property housing of meth lab supports an inference that the defendant had constructive possession of the items found therein. Now in this case, the defendant's personal property wasn't found in the house, but the fact that he chose to carry the key on that day, he occupied a station directly across from which he could observe the door, and only the day before he moved in and out freely. Those are the attorneys' personal property. Thank you, Ms. McKelvey. Thank you, Your Honor. Rebuttal, Mr. Estes? Yes. Thank you, Your Honor. Judge Hartman, I believe I misspoke when I answered your question before whether there was any cases that I'm aware of where the defendant was found alone in an apartment. I believe the United States versus Holland, the defendant was found alone. That's cited on a brief. If not, then he was there with his girlfriend. And the evidence was that there was heroin on a dresser. There were the defendant's clothes he removed from the dresser when the police arrived. The police came in to get dressed. The court in that case found the evidence to be insufficient. The court said, perfectly true, the defendant may be guilty. The trouble with the absence of evidence is that it's consistent with any hypothesis. There's no answer to say if the government does it. The government says in this case that it's a close case, therefore it should go to the jurors. The D.C. Circuit said for the juror to convict on this evidence, it's pure speculation. I would submit it's the same here. The government council made a point of saying that the police must have broken down the front door, I mean the back door, and that's why the back door. I understand the point is it's equivocal. We can't be sure whether the group of Hispanics broke down the back door or whether the police did when they entered. Do we know for sure one way or the other? Actually, at page 265 of the appendix, one of the police officers was asked, so the door had to have been broken down, the front door. And the answer was, you're probably right, because nobody would have answered the front door, so they broke it down. So we have testimony from one of the police officers that it was the front door that the police broke down, not the back door, for whatever that matter. Probably, yeah. The government cites zero cases in this case to support its argument, and the one case that they're relying on is United States v. Brett. And as Judge Barrett pointed out, there was so much additional evidence in that case beyond the mere possession of a key on the defendant's part to a crack house, not that he had moved out of three weeks earlier, but that he had never lived in. But this court, when commenting upon the evidence in Brett, said, in short, the defendant's possession of a key to the house was only one among a number of factors, all of which supported the conclusion that he knew about and had dominion and control over the drugs found in that house. Here we have no other evidence. There is nothing connecting Mr. Bates to the heroin in the officer's bedroom. There's nothing even showing that he had knowledge of the heroin in that officer's bedroom. The government keeps saying that for all practical purposes, only your client had access. What do you say to that? Well, the government's own evidence from their own drug-trafficking expert was that there were other people, multiple people, involved with the heroin. Multiple? Multiple. Realtor. No, the government's drug-trafficking expert said there would have been multiple people. There would have been. There would have been that amount of heroin. Involved in distributing the heroin, that doesn't mean they were in the house. We don't know if they brought it to the house or whether your client got it and brought it. I mean, that's all speculation. Well, the drug-trafficking expert testified why you would have needed multiple people would have been to take the heroin, cut it, process it, and put it into 363 tiny glassine bags. That apparently was going on in the house, and that's why apparently there were multiple people in the house involved with the heroin, and there is no evidence that these dogs were going there. The crack. The crack. Multiple people. Right. And as far as the last point about whether they would have left the house unguarded with this heroin in it, if you look at the Vasquez-Chan case that I referred to earlier, that's the Ninth Circuit case that was discussed at Lincoln-Jenkins and Brown, and in that case there were 650 kilograms left in the house. The two people who were found with the 650 kilograms were found innocent. I mean, the Ninth Circuit reversed their convictions, and the government could have made the exact same argument there that they must have been trusted members of the cocaine conspiracy if they would have been alone with this cocaine. But the Ninth Circuit said no. It said it's not enough just to be found in incriminating circumstances. Let's assume we agree with you that there's no evidence at all from which a rational juror could find that your client was involved with the physical handling or cutting and packaging of the heroin. Would you address the stash house angle that the government pursues? Why can't this jury conclude that your client offered up his former residence over which he had dominion and control with the key as a stash house? There's no evidence to support that. That would just be pure speculation. In fact, it would be contrary then to the testimony of the drug-trafficking expert that anyone involved with this heroin conspiracy would not be selling drugs from that location. Actually, there's not only no evidence to support that he offered up his former house, there's evidence from the drug-trafficking expert that's contrary to such a theory. Anything else? Okay. Thank you, Mr. Epstein. Thank you. Take the case. I would advise an excellent argument and briefing by both sides. Thank you. Thank you.